_____

METSO MINERALS INDUSTRIES, INC.,

       Plaintiff,

v.                                           Case No. 07-CV-926

FLSMIDTH-EXCEL LLC,
EXCEL FOUNDRY & MACHINE, INC.,
JOSEPH P. MARTINEZ,
CHERYL A. SULLIVAN,
RICHARD A. PARSONS,
DOUGLAS M. PARSONS,
KENNETH L. OLSON, and
CHRISTOPHER P. WADE

       Defendants.
_____

## ORDER

On October 17, 2007, plaintiff Metso Minerals Industries, Inc. ("Metso") filed suit against FLSmidth-Excel LLC ("Excel"). In the ensuing years, Metso filed several amended complaints, adding numerous new defendants. Since the time this action was filed, the parties have busied themselves filing amended complaints, filing answers and counterclaims to the numerous amended complaints, not to mention unending spats over every conceivable discovery related issue. Thus, over two years after this case was filed,[1] the only non-discovery issue ripe for decision is Metso's Motion for Partial Summary Judgment (Docket #114) on Excel's counterclaims for unfair competition, tortious interference with contract, and

---

[1]This case was originally assigned to Chief Judge Clevert. It was reassigned to this branch of the court on September 1, 2009.

intentional interference with prospective economic advantage. For the reasons stated below, Metso is entitled to summary judgment on each of these counterclaims.

## BACKGROUND

Metso and Excel are each engaged in the manufacture and sale of high performance conical rock crushers.[2] (Excel's Opp. to Metso's Statement of Facts Supp. Mot. Part. S.J. [Docket #137] [hereinafter "Excel Opp. SOF"] ¶ 1). Metso and Excel are competitors. Metso produces a crusher named the HP400. (Id. ¶ 3). In March 2005, Metso attended a trade show in Las Vegas where Excel was displaying a new product, the Raptor XL400 ("the Raptor") conical rock crusher. (Id. ¶ 7). Metso maintains that the Raptor "is in many ways identical" to Metso's HP400, and Excel concedes that there are at least some parts of the Raptor that are interchangeable with Metso's HP400 (Id. ¶¶ 8-9), and that the Raptor contains certain parts that were copied from Metso's HP400 (Id. ¶ 17).

Metso outsources several of the components of the HP400 to GS Hydraulics ("GS"), which is a manufacturer and distributor of complete custom hydraulic, lubrication and electronic components and systems. (Id. ¶ 3). Metso (and its predecessors) have been working with GS for almost thirty years. (Id. ¶ 5). Metso

---

[2]Rock crushers are used in the mining and aggregate industries. The conical rock crushers at issue in this case operate on the "Symons" principle. The "Symons" principle generally refers to the mode of operation that uses a motor, connected to the machine by a shaft and gearbox to drive an eccentric rotating around a vertical shaft that causes a mushroom shaped head to gyrate and crush rock between the surface of the head and the top of the machine (referred to as the "bowl"). (Excel Br. Opp. Mot. Part. S.J. [Docket #135] at 2 n. 3).

2

and GS maintain a confidentiality agreement (dating back to 1980) that requires GS to protect the "Information"[3] Metso shares with GS. (Id. ¶ 6). In 2004, Excel selected GS as its vendor to design and manufacture certain systems for the Raptor (Id. ¶ 14); (Excel SOF [Docket #136] ¶ 12).

In early May 2005 – shortly after seeing the Raptor at the 2005 Las Vegas trade show – Metso arranged a meeting with GS, at which Metso expressed concern about GS designing and manufacturing systems for Excel. (Excel Opp. SOF ¶ 20). Specifically, Metso told GS that Metso was concerned that Metso's proprietary information was not adequately protected since GS was also supplying Excel. (Id. ¶ 21). Due to GS's small size, GS did not have enough engineers to create a distinct engineering team for each customer, thus resulting in the possibility that certain engineers could end up working on both Metso projects and Excel projects. (Id. ¶¶ 11-13). Thus, at the Metso-GS meeting, Metso informed GS that if GS continued its relationship with Excel, Metso would seek out a different vendor. (Id. ¶¶ 21, 24). Metso stated that both GS and Metso were free to do business with whoever they chose, and it left the choice to GS to decide which of the two companies (Metso or Excel) it wanted to continue with. (Id. ¶¶ 24, 25). A week after the meeting, GS informed Metso that it would transition Excel to a different supplier. (Id. ¶ 30). Metso did not give a deadline by which GS was required to stop working with Excel. (Id. ¶ 31). Additionally, Metso did not object to GS fulfilling Excel's

---

[3] "Information" includes: "all [Metso] drawings, specifications, know-how, notes, data and other information including technical information." (Excel Opp. SOF ¶ 6)

3

outstanding purchase orders, or to GS facilitating Excel's transition to another vendor.[4] In August 2005, once the transition to the other vendor (Barker Rockford) was complete, Excel chose to cancel its last two outstanding orders with GS, and reissue them to Barker Rockford, though GS would have filled those last two orders (just as it had filled all of Excel's other outstanding orders) if Excel had not cancelled them. (Id. ¶¶ 46-49).

Despite GS's efforts to provide Excel a smooth transition, Excel was ultimately not happy with Barker Rockford. (Excel SOF ¶¶ 30-39). Ultimately, Excel decided to cease doing business with Barker Rockford, and switched to yet another vendor, Ritter Engineering. (Id. ¶¶ 40-42). Excel claims that its relationship with Barker Rockford was costly for Excel, and resulted in financial loss as well as loss of reputation. (Id. ¶¶ 41, 44).

## ANALYSIS

I.  **Summary Judgement Standard**

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact

---

[4] GS facilitated Excel's transition by selecting for Excel a vendor – a company named Barker Rockford – that Excel believed would be familiar with the parts used in Excel's system, and by bringing some of Barker Rockford's employees to GS's offices to train them on how to assemble the systems for Excel, and by providing Barker Rockford with all of the drawings and documents concerning the Excel systems. (Excel Opp. SOF ¶¶ 37-45).

4

is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

**II.     Tortious Interference with Contract**

Under Wisconsin law, in order to prevail on a tortious interference claim, a plaintiff must satisfy five elements: "(1) an actual or prospective contract existed between the plaintiff and a third party; (2) the defendant interfered with that contract or prospective contract; (3) the interference was intentional; (4) the interference caused the plaintiff to sustain damages; and (5) the defendant was not justified or privileged to interfere." *Skank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999); *see also Briesemeister v. Lehner*, 2006 WI App 140, ¶ 48, 720 N.W.2d 531, ¶ 48.

As to the first element, despite Excel's prostrations to the contrary, it is clear that no existing contract between Excel and GS was interfered with. According to deposition testimony from Excel's president (Gary Beerkircher) and GS's president

5

(John Thornton), the only contractual agreement between Excel and GS was the purchase orders Excel had placed with GS. (Cross Decl., Ex. C, Beerkircher Dep. 32:1-23; Cross Decl., Ex. A, Thornton Dep. 42:12 - 43:12). It is undisputed that GS fulfilled all of Excel's outstanding purchase orders, except for the last two which Excel voluntarily cancelled. (Excel Opp. SOF ¶¶ 46-49). Excel tries to argue that there was an "oral supplier agreement between Excel and GS" whereby "GS would assist with the design of the system and, in exchange for that assistance, Excel would purchase its needed hydraulic and lubrication systems from GS." (Excel Br. Opp. Mot. Part. S.J. at 15-16). The only support Excel offers for this position is Beerkircher's Declaration, made September 14, 2009. (Decl. Beerkircher [Docket #141] ¶ 4). However, this declaration contradicts his previously given deposition testimony (taken December 16, 2008) in which he was asked: "Was there an overarching agreement with G.S. . . . or was it done on a purchase order invoice basis as far as you recall?" and he answered: "I believe it was just done on a purchase order basis." (Cross Decl., Ex. C, Beerkircher Dep. 32:14-19). It is axiomatic that "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168 (7th Cir. 1996). Thus, Excel cannot create a material issue of fact as to the existence of a contract that both Beerkircher and Thornton denied the existence of in their deposition testimony.

6

The lack of an existing contract is not necessarily fatal to Excel's claim though, as the first element of tortious interference requires either an existing or a prospective contract. It is evident that Excel did have prospective contracts with GS, because Excel was clearly going to place additional purchase orders with GS (as demonstrated by the need to transition Excel to a new vendor to fulfill future purchase orders), and it is clear that absent Metso's intervention, GS would have accepted future purchase orders (Excel Opp. SOF ¶ 29). Thus, the first element is met.

It is the fifth element, however, on which it is clear that Excel cannot prevail. Metso asserts two separate privileges justifying its actions: the privilege to protect proprietary information, and the privilege to compete. Metso's reply brief appears to suggest that it believes the burden is on Excel to show that Metso's actions were not privileged. (Metso Reply Br. Supp. Mot. S.J. at 7-8). This is simply not true. The burden would be on Excel (at trial or on Excel's motion for summary judgment) to demonstrate the first four elements of tortious interference are met,[5] but as for the fifth element – privilege – the burden lies with the party asserting the privilege, in this case Metso. *Finch v. Southside Lincoln-Mercury, Inc.*, 2004 WI App 110, ¶ 38, 685 N.W.2d 154, ¶ 38; *see also* Wis JI-Civil 2780. Thus, to prevail on summary

---

[5]Here again is another area of apparent confusion, for it sees that Metso believes that Excel is charged with proving, at this phase of the proceedings, each of the elements of tortious interference. (Metso Reply Br. Supp. Mot. S.J. at 12-14). However, that would only be the case if Excel had moved for summary judgment. It did not. Rather, Excel has the burden of showing that there is a material issue of triable fact as to each of the first four elements; it has done so (indeed, Metso has not even presented credible argument that Excel has not done so). As to the fifth element, privilege, the burden is on Metso, and Excel must only show that there is a material issue of triable fact if Metso can first demonstrate that it was privileged.

7

judgment, Metso must conclusively demonstrate that its actions were privileged. Conversely, to survive summary judgment, Excel must demonstrate that there is at least a material issue of triable fact as to whether Metso's actions were privileged, yet Excel must only demonstrate this if Metso can first demonstrate that its actions were privileged.[6]

The first privilege Metso asserts is that of a party's right to protect a legally protected interest, such as proprietary information. The rule in Wisconsin regarding this privilege is that:

> One who, by asserting in good faith a legally protected interest of his [or her] own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his [or her] interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

*Briesemeister v. Lehner*, 2006 WI App 140, ¶ 52, 720 N.W.2d 531, ¶ 52 (quoting Restatement (Second) of Torts, § 773 (1979)). Thus, to demonstrate this privilege, Metso must show: 1) it acted in good faith; 2) it reasonably believed that Excel's relationship with GS could impair its proprietary information; and 3) that the means it employed were appropriate to protect said proprietary information. All of the evidence adduced by Metso supports that its actions fall squarely within this privilege, and Excel has adduced very little contradictory evidence. However, issues such as whether a party "acted in good faith" or what a party "reasonably believed"

---

[6]This means that if Metso could not adduce the requisite evidence showing it was privileged, then Excel would have no burden in regards to the fifth element whatsoever.

8

are almost exclusively questions of fact for a jury because they hinge to a substantial degree on the credibility of individual witnesses. Thus, despite the strong indication that Metso's actions were privileged, the court is unprepared to rule definitively, at this stage in the proceedings, that Metso's actions fall within the legally-protected-interest privilege.

Metso also asserts that its actions were justified by the privilege to compete. The test for this privilege is more objective than the legally-protected-interest privilege. The rule in Wisconsin regarding the privilege to compete is found in § 768 of the Restatement of the Law of Torts:

> Sec. 768 Privilege of Competitor.
> (1) One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if
> > (a) the relation concerns a matter involved in the competition between the actor and the competitor, and
> > (b) the actor does not employ improper means, and
> > (c) the actor does not intend thereby to create or continue an illegal restraint of competition, and
> > (d) the actor's purpose is at least in part to advance his interest in his competition with the other.
> (2) The fact that one is a competitor of another for the business of a third person does not create a privilege to cause the third person to commit a breach of contract with the other even under the conditions stated in Subsection (1).

Restatement of Torts § 768 (quoted in *Pure Milk Products Co-op v. National Farmers Organization*, 219 N.W.2d 564,573 (Wis. 1974)). "In cases [such as the instant case] where no breach of contract results from the interference, the tort is really a branch of the law of unfair competition, and it is necessary for liability that the

9

alleged tortfeasor have gone beyond the accepted norms of fair competition." *Frandsen v. Jensen-Sundquist Agency, Inc.*, 802 F.2d 941, 948 (7th Cir. 1986).

The applicable evidence clearly shows that elements (a), (b) and (d) are satisfied in the instant case. Indeed, Excel essentially concedes as much. (Excel Br. Opp. Mot. S.J. at 23-24 (only offering argument as to whether Metso employed improper means)). Excel claims that Metso was not justified under the privilege to compete because such privilege does not justify causing a party to breach a contract. (Id. at 23). However, as the court has already shown, GS did not breach any contract with Excel. (Supra at 5-6). Excel also claims that the competition privilege contains a "good faith" element, (Excel Br. Opp. Mot. S.J. at 23); however, the case Excel cites in support of this contention, *Frandsen*, simply does not create such a requirement (indeed, the term "good faith" does not appear anywhere in the *Frandsen* decision; rather *Frandsen* states that when there is no breach of contract, there is no liability unless the defendant engaged in "unfair competition"). 802 F.2d at 947-948.

Turning to the one disputed element of the competition privilege – whether Metso employed "wrongful means" – the court finds the commentary of the Restatement to be particularly helpful. Wrongful means include: "physical violence, fraud, civil suits and criminal prosecutions." Restatement (Second) of Torts § 768 (1979) (cmt. *e*). Means that are permissible, so long as they do not violate element (c), include: "refus[ing] to deal with the third persons [(i.e. GS)] in the business in

10

which [the actor (i.e. Metso)] competes with the competitor [(i.e. Excel)] if they deal with the competitor," and "refus[ing] other business transactions with the third person relating to that business." Id. Metso's action of informing GS that it would take its business elsewhere if GS continued to work with Excel clearly is permissible conduct, not wrongful conduct, according to the Restatement.

Excel points to an example from § 766 of the Restatement as supporting its argument that Metso used improper means. The example states:

> Upon hearing of B's contract with C, A ceases to buy from B. When asked by B to explain his conduct, A replies that his reason is B's contract with C. Thereupon B breaks his contract with C in order to regain A's business. A has not induced the breach and is not subject to liability to C under the rule stated in this Section.

Restatement (Second) of Torts § 766 (1979) (cmt. *l*, Illustration 1). Excel argues that Metso's conduct was "inapposite" of this example because "Metso did not simply stop buying from GS[,] [rather] Metso told GS to stop doing business with Excel or else." (Excel Br. Opp. Mot. S.J. at 23). First, this example is inapplicable because it expressly deals with a party inducing a third party to breach a contract with the competitor. GS did not breach a contract with Excel. Further, Metso did not ask GS to breach a contract with Excel, as evidenced by the fact that Metso did not threaten GS with a loss of business when GS stated that it intended to fulfill Excel's outstanding purchase orders (the only contract in place between GS and Excel). Secondly, Metso's conduct was not "inapposite" of the above example; Metso's conduct was almost completely in-line with the example, save for the fact that

11

instead of simply ceasing to buy from GS, Metso first informed GS that it was going to do so and why it was going to do so. To argue that informing GS prior to ceasing to buy from GS takes Metso outside this example, as Excel does, completely fails to appreciate the nature of GS's business. GS is not a vendor selling stock products. GS designs, manufactures, and provides maintenance and support for, complex mechanical and electrical systems. The intricacy of the relationship between GS and its customers is evidenced by the time and effort that went into transitioning Excel to Barker Rockford. To require Metso to undergo such efforts, without informing GS why it was doing so before hand, would be the height of inefficiency.

Thus, Metso's conduct conformed to the above example as closely as it could. It did not threaten GS, it did not say it would never do business with GS again, it simply informed GS that GS's business with Excel was a cause of serious concern for Metso, and that GS and Metso were both free to do business with whomever they chose. To the extent that conveying this information to GS placed economic pressure on GS,[7] this is perfectly permissible so long as such pressure was not unrelated to the business in which Metso and Excel compete – which it clearly was

---

[7]When forced to choose between Metso and Excel, it is logical that GS would choose Metso, as Metso accounted for a large portion of its business. However, Excel seems to think that the very fact that Metso accounted for so much of GS's business means that Metso is per se precluded from refusing to do business with GS if GS is going to do business with Excel, because such a choice *forces* GS to abandon Excel. First, Metso has the freedom to make such a choice, so long as it employs permissible means, which it did. Second, Metso did not force GS to choose Metso over Excel. Excel was free to use any manner of tactics (i.e. offering to pay GS more, offering GS an ownership interest, convincing GS that Excel would be a better customer or would soon be a bigger customer, etc) to convince GS that it should choose Excel over Metso. The fact that Excel failed to do so, though not unsurprising given business realities, is not the fault of Metso.

12

not. *Darby Trading Inc. v. Shell Int'l Trading and Shipping Co. Ltd.*, 568 F. Supp. 2d 329, 346 (S.D. N.Y. 2008).

Metso has demonstrated that its actions met each of the elements of the competition privilege. Accordingly, Metso's actions were privileged, which means that Excel's tortious interference claim necessarily fails as to the fifth element of such a claim. Metso is, therefore, entitled to summary judgement on Excel's claim for tortious interference with contract.

### III. Intentional Interference with Prospective Economic Advantage

Given that the only contract Metso is alleged to have tortiously interfered with was a prospective contract, the analysis for intentional interference with prospective economic advantage is identical to the above analysis for tortious interference with contract. Metso is entitled to summary judgment as to this claim since its actions were justified by its privilege to compete.

### IV. Unfair Competition

Excel does not oppose Metso's motion for partial summary judgment as to the common law unfair competition claim. (Excel Br. Opp. Mot. Part. S.J. at 14 n.18). Thus, the court will grant Metso summary judgment as to Excel's unfair competition claim as well.

## CONCLUSION

Based upon the court's findings that Metso's actions were justified by the privilege to compete, Metso is entitled to summary judgment on Excel's two

13

interference claims. Excel has raised no material issue of triable fact indicating that such was not the case. Per Excel's stipulation, Metso is entitled to summary judgment on Excel's unfair competition claim.

Accordingly,

**IT IS ORDERED** that Metso's Motion for Partial Summary Judgment on Excel's Counterclaims for Unfair Competition, Tortious Interference with Contract, and Intentional Interference with Prospective Economic Advantage (Docket #114) be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 5th day of January, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge