─────────────────────────────────────────────

METSO MINERALS INDUSTRIES, INC.,

        Plaintiff,

v.                                                     Case No. 07-CV-926

FLSMIDTH-EXCEL LLC,
EXCEL FOUNDRY & MACHINE, INC.,
JOSEPH P. MARTINEZ,
CHERYL A. SULLIVAN,
RICHARD A. PARSONS,
DOUGLAS M. PARSONS,
KENNETH L. OLSON, and
CHRISTOPHER P. WADE,

        Defendants.

─────────────────────────────────────────────

# ORDER

On October 17, 2007, plaintiff Metso Minerals Industries, Inc. ("Metso") filed suit against FLSmidth-Excel LLC ("Excel"). In the ensuing years, Metso filed several amended complaints, adding numerous new defendants. In Metso's fifth, and final, amended complaint, it alleged that all of the defendants (excluding Cheryl Sullivan) partook in misappropriation of certain trade secrets from Metso. Defendants[1] have moved for summary judgment as to Metso's trade secret misappropriation claims related to the HP400,[2] arguing that Metso does not own the relevant trade secrets and thus does not have standing to assert a claim for their misappropriation. After

---

[1] In this Order, the court will use the term "defendants" to refer to all the defendants in this case, excluding Cheryl Sullivan and Kenneth Olson. (Olson is excluded because, though he is alleged to have misappropriated trade secrets, those secrets do not pertain to the HP400, thus are not relevant to the instant motion.)

[2] The HP400 is a rock crusher produced by Metso.

consideration of the parties' arguments, the court concludes that Metso does have standing to pursue these claims, and thus the defendants' motion for summary judgment on these claims is denied.

## BACKGROUND

Metso is engaged in the manufacture and sale of high performance conical rock crushers, including the model HP400. In December of 2002, Metso sold all of the engineering, design information, and intellectual property rights (except for patent and trademark rights) related to the HP400 to Metso Minerals Macon ("Macon"), a separate legal entity located in Macon, France. As part of that transaction, Macon granted to Metso a non-exclusive, royalty-free right to continue to use the technology for service and warranty repair for the products sold by Metso.

Metso contends that two of the individual defendants, Messrs. Wade and Martinez, misappropriated trade secrets relating to the HP400. Martinez was previously employed by Metso, and Wade was previously employed by one of Metso's authorized repair facilities; both are currently employed by Excel. Metso alleges that Wade impermissibly took HP400 technical data sheets and other Metso detailed design information to his new job at Excel Foundry & Machine, Inc. ("Foundry"), and then to Excel where he transferred a year later. Metso alleges that Martinez impermissibly took a copy of the HP400 General Assembly, Master Layout CAD[3] file with him to his new job at Excel. Metso also maintains that Richard Parsons and Douglas Parsons, both high ranking officers in both Foundry and

---
[3] CAD stands for: computer-aided design.

Excel, knew of (or had reason to know of) and actively encouraged such acquisition of confidential information pertaining to the HP400. According to Metso, defendants used the HP400 trade secret information to design and build the XL400, a conical rock crusher sold by Excel. Metso claims that since the XL400 entered the market, Metso has lost at least thirty-four HP400 sales to Excel.

**ANALYSIS**

Defendants have moved for summary judgment on Metso's claims pertaining to HP400 trade secrets. Defendants claim that because Metso did not "own" the HP400 trade secrets when they were taken, but rather merely possessed such information pursuant to a non-exclusive license[4] with Macon, Metso, therefore, does not have standing to sue defendants for the misappropriation of such trade secrets. Defendants also assert, without any argument in support thereof, that Metso is not the "Real Party in Interest" as required by Fed. R. Civ. P. 17(a)(1).

## I. Summary Judgment Standard

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party.

---

[4] Defendants would certainly disagree with classifying Metso's interest in the HP400 trade secrets as a "non-exclusive" license. However, the court's holding hinges on Metso's lawful possession of the trade secrets (an issue not contested) rather than the extent of Metso's proprietary interest in the trade secrets. Thus, whether or not Metso's interest is in fact a "non-exclusive" license is irrelevant to the court's holding.

-3-

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II.    Standing

Federal courts are, per Article III of the Constitution, limited to adjudicating actual "cases" and "controversies." From this limitation emerges the requirement that a litigant have "standing" to invoke the power of a federal court. To have constitutional standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984) (citation omitted). The test for constitutional standing is a three-part inquiry:

1. The plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.

2. There must be a causal connection between the injury and the conduct complained of.

3. It must be likely as opposed to merely speculative that the injury will be redressed by a favorable decision.

*See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendants' argument focuses exclusively on the first question – whether plaintiff has suffered the invasion of a legally protected interest.

Metso's cause of action for misappropriation of trade secrets arises from Wisconsin's version of the Uniform Trade Secrets Act, Wis. Stat. § 134.90. Thus, for Metso to demonstrate that misappropriation of its HP400 trade secrets constituted the invasion of a legally protected interest, it must show that its interest in those trade secrets is protected by § 134.90. The statute reads in relevant part:

> **(2) Misappropriation.** No person, including the state, may misappropriate or threaten to misappropriate a trade secret by doing any of the following:
>
> (a) Acquiring the trade secret of another by means which the person knows or has reason to know constitute improper means.

Wis. Stat. § 134.90(2). Thus, the question before the court is whether § 134.90 requires that a plaintiff "own" the trade secret in order to bring suit for the trade secret's misappropriation. Both parties agree that this is a question that the Wisconsin courts have not addressed. Defendants maintain that the plain language of the statute requires ownership, and that persuasive case law requires ownership. Metso argues that the plain language of the statute does not require ownership, and that persuasive case teaches that possession of the misappropriated trade secret is sufficient to confer standing under the act.

Clearly, the above cited portion of § 134.90 does not expressly limit protection under the statute to those who own the trade secret in question. Defendants argue that the statute's utilization of the phrase: "the trade secret *of another*" (emphasis added) implicitly limits trade secret protection to owners. However, the phrase "of another" on its face simply describes the relationship between the misappropriator and the trade secret – namely that the trade secret belongs to one other than the misappropriator. The phrase does not, implicitly or otherwise, limit protection only to the "owner" of the trade secret. Presumably, if the legislature had wanted to so limit the protection of the act it would have used language explicitly stating as much. *See* Wis. Stat. § 943.205 (making it a Class I felony to "with intent deprive or withhold *from the owner* thereof the control of a trade secret") (emphasis added).

Rather, the legislature adopted the language of NCCUSL's[5] Uniform Trade Secrets Act ("UTSA"). Such language appears not to be designed to limit standing to "owners" as evidenced by a comment to the UTSA which states: "Where more than one person is entitled to trade secret protection with respect to the same information, only that one from whom misappropriation occurred is entitled to a remedy." Uniform Trade Secrets Act §§ 2, 3 cmt. (2005). This comment is certainly not dispositive to the instant issue because the comment assumes the parties in question are entitled to trade secret protection, which is not something the court can assume since that is the very question the court is seeking to answer. However, the

---

[5] The National Conference of Commissioners on Uniform State Laws is a non-profit association of lawyers who draft model legislation regarding areas of law in which they believe it would be best to have uniformity of law among the states. To date, forty-five states, as well as the District of Columbia and the Virgin Islands, have adopted variations of NCCUSL's Uniform Trade Secrets Act.

comment is useful in that it clearly contemplates that multiple parties could be entitled to trade secret protection as to the trade secret. Somewhat telling is the fact that the comment uses the phrase: "[w]here more than one person is entitled to trade secret protection" rather than stating "where two people are entitled to trade secret protection." According to defendants the most parties that would ever be capable of having trade secret protection would be two (the owner of the trade secret and an exclusive licensee of the trade secret). The comment teaches away from such a conception. Additionally, the comment focuses not on the nature or extent of the plaintiff's rights in the trade secret, but rather it focuses on the nature of the plaintiff's relationship to the misappropriator. This focus on protecting the party from which the misappropriation occurred is reflected in the Wisconsin Supreme Court's elucidation that the "basis of the [trade secrets] doctrine is an attempt to enforce morality in business," as well as in that court's identification of the existence of a trade secret, and a breach of confidence, as two basic themes of trade secret law. *Abbot Laboratories v. Norse Chemical Corp.*, 147 N.W.2d 529, 533 (Wis. 1967).

Though the relevant language of the statute does not expressly limit statutory protection to the owner or exclusive licensee of the trade secret, and though the comment to the UTSA teaches away from imposing such a limitation, defendants argue that § 134.90(3)(b) evidences that such a limitation should be imposed. Wis. Stat. § 134.90(3)(b) reads in relevant part:

> In exceptional circumstances, an injunction granted under par. (a) may condition future use of a trade secret by the person who violated sub. (2) upon payment of a reasonable royalty by that person

> to the owner of the trade secret for no longer than the period of time for which the court may enjoin or restrain the use of the trade secret under par. (a).

Id. However, Metso is not seeking a royalty under § 134.90(3)(b); Metso is seeking compensatory damages, punitive damages, attorney fees, and injunctive relief. The portions of the statute pertaining to injunctive relief, damages, and attorneys fees make no reference to an "owner" of the trade secrets, rather they allude only to the "complainant" and the "prevailing party." *See* Wis. Stat. §134.90(3)(a) & (4). Metso is certainly the "complainant," and Metso could certainly conceivably end up being the "prevailing party." Thus, there is no indication from the text of the statute that Metso would not fall within the protection of § 134.90.

Defendants next argue that persuasive case law requires the court to find that Metso does not have standing to pursue its HP400-related trade secret misappropriation claims. Defendants cite to four cases in which courts either held or stated that non-exclusive licensees of misappropriated trade secrets did not have standing to bring suit under various iterations of the UTSA. However, each of these cases is distinguishable.

Defendants describe *Omnitech Int'l., Inc. v. Clorox Co.*, 11 F.3d 1316, 1323 (5th Cir. 1994) as "affirming on other grounds but noting district court was correct in finding plaintiff could not assert trade secret misappropriation claim against Clorox because plaintiff had previously transferred relevant trade secrets to another company." (Defs. Br. Supp. Mot. S.J. [Dkt. 286] at 12). However, this description of *Omnitech* is simply disingenuous. The *Omnitech* court explained that the trial

-8-

court granted Clorox's Rule 50 motion on Omnitech's trade secrets claim because the trial court found that: 1) Omnitech had transferred any trade secrets it had to a third party; 2) that Omnitech did not own the trade secrets and did not have any interest in them;[6] and 3) that Omnitech thus did not have standing to sue for misappropriation. *Id.* at 1323. The *Omnitech* court went on to state that "[t]he district court was correct in resolving this claim as a matter of law," however, the court of appeals affirmed the trial court's holding on different grounds – namely that there was insufficient evidence of misappropriation by Clorox. *Id.* Thus, contrary to defendants' assertion, the *Omnitech* court made no statement as to the correctness of the trial court's finding that Omnitech did not have standing; rather it merely stated that the trial court was correct to have addressed the standing issue as a matter of law. In fact, the only dicta from the *Omnitech* court regarding standing actually weakens the instant case defendants' argument. The *Omnitech* court stated:

> The undisputed evidence proves that Omnitech sold all of its Dr. X assets to Ogden in exchange for a sizeable sum of cash prior to its execution of the non-disclosure agreement and letter of intent [with Clorox] . . . . Thus, there is some question (which we do not decide) as to whether Omnitech had standing, as a non-owner, to make out a misappropriation claim.

*Id.* at 1323 n. 8. While the standing issue was not addressed or decided by the court of appeals, one cannot help but note that the court, despite stating that it was undisputed that Omnitech had sold the trade secrets prior to its dealings with Clorox,

---

[6] The fact that Omnitech retained no interest in the disputed trade secrets is a significant difference between *Omnitech* and the instant case. There is no dispute that Metso retained some rights in the trade secrets defendants allegedly misappropriated.

-9-

still only went so far as to say there was "some question . . . as to whether Omnitech had standing." Under defendants' proffered view of standing in trade secret cases, there would have been no question as to the fact that Omnitech lacked standing. This court, in reaching its holding in the instant case, certainly is not relying on the *Omnitech* court's dicta regarding standing; however, suffice it to say that *Omnitech* offers no support for defendants' position, and could conceivably be read as offering very mild support for Metso's position.

Defendants also cite to *RMS Software Development, Inc. v. LCS, Inc.*, 1998 WL 74245, (Tex. App) in support of their claim that Metso lacks standing. The *RMS* court found that the plain language of the Colorado Uniform Trade Secret Act (the applicable law in the case) "contemplate[d] that the 'owner' of a trade secret is responsible for preventing its unauthorized disclosure." *Id.* at 4. The *RMS* court thus held that the plaintiff, which was not the "owner" of the trade secrets, therefore lacked standing to sue for trade secret misappropriation. The basis for the *RMS* court's opinion was the portion of the Colorado Uniform Trade Secret Act that defines trade secret:

> "Trade secret" means the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers or other information relating to any business or profession which is secret and of value. To be a "trade secret" **the owner** thereof must have taken measures to prevent the secret from becoming available to persons **other than those selected by the owner** to have access thereto for limited purposes.

*RMS Software*, 1998 WL 74245 at 4 (emphasis in original) (quoting in full Colo. Rev. Stat. Ann. § 7-74-102(4)). Unlike the Colorado statutory language, Wisconsin's statutory definition of "trade secret" makes no reference to the "owner" of the secret. There is nothing in the Wisconsin statutory language that indicates that only the "owner" of a trade secret may be responsible for preventing the secret's unauthorized disclosure. Hence, *RMS Software* is inapposite to the question of whether or not Metso possesses standing under Wis. Stat. § 134.90.

Also inapposite is *Althin CD Medical, Inc. v. West Suburban Kidney Center, S.C.*, 874 F. Supp. 837 (N.D. Ill. 1994), another case cited by defendants as evidence that a licensee of a trade secret lacks standing to sue for misappropriation. In that case, Albert Einstein Medical College ("Einstein") owned trade secrets that it licensed to a company called Archon, which in turn licensed the trade secrets to a company named Althin. *Id.* at 839. Archon was not an exclusive licensee of the trade secrets, and thus neither was Althin. *Id.* at 838-39. Separately, Einstein also granted permission to Montifiore Medical College ("MMC") to utilize the trade secrets for the term of one year. *Id.* at 839. It was alleged that the defendants in the case, West Suburban Kidney Center (WSKC) and Dr. Sherman Levine, misappropriated the trade secrets from MMC. *Id.* Althin filed suit.

*Althin* is immediately distinguishable from the instant case, because Althin was not the party from which the secrets were allegedly misappropriated, whereas Metso is. *See* UTSA §§ 2, 3 cmt. Additionally, in finding that Althin did not have standing to sue for trade secret misappropriation, the court focused on the terms of Archon's

license from Einstein, and Althin's sub-license from Archon. The license from Einstein to Archon required Archon to notify Einstein if misappropriation occurred, and to obtain written consent from Einstein prior to filing suit. *Id.* at 841. Because Archon could not license to Althin any more rights than it had, clearly Althin was under the same contractual obligation to notify Einstein and obtain its consent before filing suit for trade secret misappropriation. *Id.* at 841-42. The court found that because Althin did not comply with these contractual requirements, Althin lacked standing on its trade secret claims. This too is distinguishable, for there is no allegation that the agreement between Metso and Macon required Metso to notify Macon of misappropriation or to obtain Macon's consent to file suit. Not only is *Althin* distinguishable, it simply does not support defendants' argument. The *Althin* court's ruling on Althin's standing to bring trade secret claims was based purely on Althin's failure to comply with its contractual obligations. The court gave no indication that Althin lacked standing due to the fact that it merely possessed but did not "own" the trade secrets at issue.[7]

The only case cited by defendants, regarding the standing of a "non-owner" to sue for trade secret misappropriation, that actually supports defendants' proposition is *Gabriel Int'l, Inc. v. M & D Industries of Louisiana, Inc.*, 719 F. Supp. 522 (W.D. La. 1989). However, that is a four page opinion, decided in 1989, which

---

[7] Defendants' misleadingly quote the *Althin* court as stating "Given the licensor's retention of these substantial rights, this court finds that Archon [and therefore Althin as the sub-licensee], the licensee, was not an exclusive licensee and, thus, had no standing to sue." (Defs. Reply Br. Supp. Mot. S.J. at 10) (quoting *Althin*, 874 F. Supp. at 843). However, defendants present this quote completely out of context. The court made this statement in its discussion of Althin's copyright claims. The quoted language has no relation to the discussion of whether Althin had standing to bring its trade secret claims.

conclusorily states that the Louisiana's UTSA[8] requires that a "[p]laintiff must be the owner of [the] trade secret" in order to have standing. *Id.* at 524. The *Gabriel* court does not discuss how much of an interest in a trade secret a plaintiff would have to have to be considered an "owner," nor does the court cite any case law or rationale in support of its conclusion.[9] If *Gabriel* were the only case law available on the matter, it would of course be somewhat useful. However, *Gabriel*'s persuasiveness (to the limited extent that it is persuasive) is dramatically overshadowed and contradicted by the more recent, and well reasoned, opinion delivered by the Fourth Circuit in *DTM Research, L.L.C. v. AT&T Corp.*, 245 F.3d 327 (4th Cir. 2001).

In *DTM*, the Fourth Circuit Court of Appeals held that a company that had neither "fee simple ownership" of a trade secret, nor had an exclusive license to the trade secret, nonetheless had standing to sue for misappropriation of the trade secret. 245 F.3d at 332. The court reasoned that "[t]he 'proprietary aspect' of a trade secret flows, not from the knowledge itself, but from its secrecy." *Id.* Thus, "one who possesses non-disclosed knowledge may demand remedies as provided by the [Maryland Uniform Trade Secrets Act][10] against those who 'misappropriate' the knowledge." *Id.* The court explained that the district court, in articulating the elements of a claim under the UTSA, should focus not on DTM's proprietary interest

---

[8] The relevant language of Louisiana's UTSA is similar to that of Wisconsin's UTSA.

[9] The *Gabriel* court does reference, as support for its conclusion, a previous ruling it made in which apparently it did cite "authorities." However, this court has no way to access that ruling, and thus no way to determine the soundness of the *Gabriel* court's logic, nor the persuasiveness of the "authorities" on which it relied.

[10] The relevant language of Maryland's UTSA is virtually identical to the relevant language of Wisconsin's UTSA.

-13-

in the trade secrets, but rather on the language of the UTSA. *See id.* ("Accordingly, if DTM demonstrates that it possesses secret information satisfying the definition of § 11-1201(e) and that AT&T misappropriated that information, as defined in § 11-1201(c), by improper means, as defined in § 11-1201(b), then DTM may be entitled to the remedies authorized by §§ 11-1202 through 11-1205.").

Defendants in the instant case attempt to distinguish *DTM* by arguing that it did not involve a licensee-licensor relationship.[11] However, this is an irrelevant distinction. *DTM* squarely addressed the question of whether a plaintiff must "own" a trade secret in order to have standing under a trade secret statute modeled on the UTSA. The *DTM* court stressed that it was plaintiff's possession of the information that mattered, not the nature of plaintiff's proprietary interest in the information. Defendants disagree with this reasoning because defendants maintain that trade secret misappropriation law should be directly analogized to patent infringement law.

It is well established that non-exclusive licensees lack standing to bring a claim for patent infringement. The requirement of an ownership interest in a patent is found in the Patent Act of 1952 itself which states "a patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. "The word 'patentee' includes not only the patentee to whom the patent was issued but also the *successors in title* to the patentee." 35 U.S.C. § 100 (emphasis added). Simply

---

[11] Separately, defendants argue that *DTM* should not be followed because it is bad public policy since it could lead to parties who attained trade secrets by improper means themselves suing if those trade secrets were then misappropriated – thus rewarding bad behavior. This is not a concern in the instant case. If this were a situation the Wisconsin courts were concerned about, they could easily adopt the rationale of *DTM* while limiting it only to "lawful possessors" of a trade secret.

-14-

being a licensee of a patent is not sufficient though, as "[a] holder of such a nonexclusive license suffers no legal injury from infringement and, thus, has no standing to bring suit or even join in a suit with the patentee." *Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1031 (Fed. Cir. 1995).

Despite defendants' arguments to the contrary, patent infringement and trade secret misappropriation are not analogous. There is no statutory language in the UTSA limiting standing based on proprietary interest as there is in the patent statute. Additionally, the reason that a non-exclusive patent licensee does not suffer legal injury from a patent infringement is because he does not own the property with which has been interfered (i.e., the patent). At its core, patent infringement is an intrusion upon the property of another. It is, of course, logical that only a party that has the right to exclude others (i.e., the owner or an exclusive licensee) from that property should have standing to sue for such an intrusion. However, misappropriation of a trade secret is not only an intrusion on property, it is also a breach of confidence. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481-82 (1974) ("The maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law."); *Abbott Lab. v. Norse Chem. Corp.*, 147 N.W.2d 529, 533 (Wis. 1967) ("The basis of the doctrine [of trade secret law] is an attempt to enforce morality in business."); *Drill Parts & Serv. Co., Inc. v. Joy Mfg. Co.*, 439 So.2d 43, 49 (Ala. 1983) (Alabama Supreme Court adopting the law of trade secret for the first time and noting that it protects generally against breach of faith and reprehensible means of learning another's secret); *Ed

*Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 942 (Wash. 1999) ("A purpose of trade secrets law is to maintain and promote standards of commercial ethics and fair dealing in protecting those secrets."); 1 Melvin F. Jager, Trade Secret Law § 1.03, at 1-4 to 1-8 ("The encouragement of increasingly higher standards of fairness and commercial morality continues to be the touchstone of trade secret law in the courts."). The victim of such a breach of confidence has suffered legal injury as a result of the breach, and has standing to file suit.[12]

Additionally, the nature of a suit for patent infringement is markedly different from the nature of a trade secret misappropriation suit. A patent infringement suit focuses on whether the alleged infringer's product or process infringes the patentee's patent. The two parties most capable of litigating such a case are the owner of the patent and the alleged infringer. However, a trade secret misappropriation case focuses heavily on whether the alleged trade secrets were "misappropriated" through "improper means." This a question that the parties which were in confidence with one another (here: Metso and defendants) are most capable of litigating. *See* Uniform Trade Secrets Act §§ 2, 3 cmt. (2005) ("Where more than

---

[12] A licensee who had come by the information lawfully pursuant to the license is arguably no different than the original "owner" of the information, at least with regard to preventing or obtaining a remedy for wrongful acquisition of the secret from it by a third party. As we stated above, the law does not protect ownership in information as such but rather protects the owner from the use of improper means to obtain that information or from its improper use. Thus, the question would be whether the licensor, licensee—even a nonexclusive licensee—or other person with lawful possession (knowledge) of the trade secret was the person from whom the trade secret was misappropriated, even though other possessors of the trade secret may be directly affected by the misappropriation. If so, this would be the person who could bring the claim[.]

MODERN LICENSING LAW § 17:10 (footnotes omitted).

one person is entitled to trade secret protection with respect to the same information, only that one from whom misappropriation occurred is entitled to a remedy." ).

Ultimately, patent infringement and trade secret misappropriation are not directly analogous, especially in regards to whom may bring suit therefor. As the court in *DTM* recognized, a party in possession of a trade secret should be able to bring suit against another party that "misappropriates" that trade secret. This holding has been followed by other courts facing similar questions. *See DaimlerChrysler Services v. Summit Nat'l*, 2006 WL 1420812, *8 (E.D. Mich. 2006) ("The Court agrees with the holding in *DTM Research* that for purposes of trade secrets law, the focus is appropriately on the knowledge, or possession, of the trade secret, rather than on mere 'ownership' in the traditional sense of the word."); *Parking Co., L.P. v. Rhode Island Airport Corp.*, 2005 WL 419827, *3 (R.I. Super. 2005) (citing *DTM* and holding that Rhode Island's UTSA[13] "does not require ownership of the property in order to have trade secret protection thereof."); *see also Fast Capital Marketing, LLC v. Fast Capital LLC*, 2008 WL 5381309, *12 (S.D. Tex. 2008) (quoting and discussing *DTM Research* approvingly in case in which party who possessed, but did not own, trade secrets was permitted to sue for misappropriation 245 F.3d);[14] *In re Cayman Island Firm of Deloitte & Touche*, 2001 WL 1042233 *2-3 (Tex. App.

---

[13] The relevant language of Rhode Island's version of the UTSA, *see* R.I. Gen. Laws 1956, § 6-41-1, is virtually identical to that of Wisconsin's UTSA.

[14] It must be stated that *Fast Capital* was decided under New York law, that New York has not adopted a version of the UTSA, and that New York case law expressly states that: "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it *possessed* a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2nd Cir. 1999) (emphasis added).

-17-

2001) (adopting *DTM*'s rationale in order to interpret that Tex. R. Evid. 507 – which allows the owner of a trade secret the privilege of refusing to disclose the secret – also allows possessors of a trade secret to utilize the privilege as well.). Given its acceptance, and the force of its reasoning, this court finds that *DTM* would likely be followed by the Wisconsin courts.

### III. Real Party in Interest

Defendants maintain that Metso is not the "Real Party in Interest" on the trade secret claims. *See* Fed. R. Civ. P. 17(a)(1) ("An action must be prosecuted in the name of the real party in interest."). However, defendants only present three arguments regarding the real-party-in-interest question: 1) that a finding of constitutional standing is not dispositive of the Rule 17 inquiry; 2) that defendants have not waived their Rule 17(a) objection; and 3) that it is too late for Metso to substitute Macon as the Real Party in Interest. Nowhere do defendants present argument as to why Metso is not the Real Party in Interest.[15] Thus, even if defendants did not waive their Rule 17(a) objections by failing to present them until summary judgment, they almost assuredly have waived such objections by failing to argue the merits of those objections at summary judgment. It is of no consequence though. The court has no difficulty in finding that Metso – the party from which the misappropriation allegedly occurred, and a party entitled to recover under § 134.90 if such misappropriation can be proven – is a Real Party in Interest.

---

[15] Presumably, defendants would argue Metso is not the Real Party in Interest for all the same reasons it presented regarding the issue of standing; however, defendants are the ones that argue that the Rule 17 inquiry is not subsumed by the standing inquiry.

-18-

**CONCLUSION**

Wisconsin's version of the UTSA does not expressly require trade secret ownership in order to bring suit for misappropriation. Additionally, comments to the UTSA teach away from such a requirement. These facts, coupled with Wisconsin's generous standing test, *see Guardianship & Protective Placement of Carl F.S.*, 2001 WI App 97, § 5, 626 N.W.2d 330[16] (a plaintiff "arguably within the zone of interests to be protected by the statute . . . in question" has standing) strongly indicate the Wisconsin Supreme Court would find that Metso could bring suit for trade secret misappropriation under § 134.90. This is especially true given the fact that trade secret protection is demonstrably different than patent protection, and that the injury suffered through trade secret misappropriation is of a different nature than the injury suffered as a result of patent infringement. Accordingly, the rationale expressed in *DTM* is highly persuasive, and would likely be adopted by the Wisconsin Supreme Court if it were to consider the question of whether Metso could bring suit under § 134.90. Thus, the court finds that Metso has alleged the invasion of a legally protected interest and, therefore, has standing on its trade secret misappropriation claims.

---

[16] The question of whether a party has standing under a state law does not necessarily resolve the question of whether a party has standing on that state court claim in federal court. However, because the only alleged obstacle to Metso having standing on the instant claims is the fact that Metso does not have a legally protected interest in the trade secrets, then the fact that Metso would have standing in state court is dispositive. This is true because the fact that Metso would have standing to bring its § 134.90 claim in state court means that Metso does have a legally protected interest in the trade secrets. Of course, in federal court Metso must still meet the stricter federal requirements; however there is no allegation that Metso does not meet any of the other Article III standing requirements.

Furthermore, despite stating that Metso is not a Real Party in Interest, defendants present no specific argument in support thereof. Regardless, in this instance the court finds that Metso is a Real Party in Interest.

Accordingly,

**IT IS ORDERED** that defendants' Motion for Partial Summary Judgment Dismissing Plaintiff's Trade Secret Claims Related to the HP400 for Lack of Standing (Docket #226) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 7th day of May, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge