**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

_____

METSO MINERALS INDUSTRIES, INC.,

        Plaintiff,

v.                                                          Case No. 07-CV-926

FLSMIDTH-EXCEL LLC,
EXCEL FOUNDRY & MACHINE, INC.,
JOSEPH P. MARTINEZ,
CHERYL A. SULLIVAN,
RICHARD A. PARSONS,
DOUGLAS M. PARSONS,
KENNETH L. OLSON, and
CHRISTOPHER P. WADE,

        Defendants.

_____

# ORDER

On October 17, 2007, plaintiff Metso Minerals Industries, Inc. ("Metso") filed suit against FLSmidth-Excel LLC ("Excel"). In the ensuing years, Metso filed several amended complaints, adding numerous new defendants. In Metso's fifth, and final, amended complaint, it alleged that three of its former employees – Martinez, Sullivan, and Olson ("the former employees") – committed breach of contract by violating nondisclosure agreements. Metso additionally alleged that the remainder of the defendants (excluding Christopher Wade) committed tortious interference with contract by encouraging the former employees to acquire and disclose information in violation of the nondisclosure agreements. Defendants[1] have moved for summary

---

[1] The term "defendants," as used in this order, refers to all of the defendants excluding Christopher Wade.

judgment as to Metso's breach of contract claims and tortious interference with contract claims. Separately, but related, Metso has moved for summary judgment against Martinez for breach of contract.

## BACKGROUND

Metso is engaged in the manufacture and sale of high performance conical rock crushers. As part of its hiring process, Metso[2] required any applicant accepted for employment to agree not disclose confidential information to anyone other than Metso's authorized representatives. Thus, in April 1995 and November 1997, respectively, prior to beginning employment with Metso, Olson and Martinez signed employment applications ("Martinez/Olson Applications") which stated:

> I further agree, if employed, to disclose promptly, and upon request, to execute a written assignment of any such Invention, Design or Improvement to the Company and not to disclose, except to authorized representatives of the Company, confidential information derived in the course of my employment.

(Defs. Br. Supp. Mot. S.J. [Dkt. 284] at 3). Likewise, Sullivan, in October 1978, signed an employment application ("Sullivan Application") that stated:

> Compensation paid an employee of [Metso] for services covers inventions and ideas and the undersigned hereby agrees in consideration for such compensation that every invention and idea conceived or developed by him/her during the term of employment, and at least in part arising from or related to any special skills for which he/she is employed, to his/her work assignments, or to [Metso] information obtained in the course of employment, is the property of and shall be promptly disclosed to [Metso], its successors or assigns, and he/she agrees on request to execute all documents to evidence its title to such inventions and improvements and to enable it to patent

---

[2] The term "Metso" is used in this order to refer to plaintiff Metso Mineral Industries, Inc., as well as its predecessors: Nordberg, Rexnord, and Allis-Chalmers.

same in any country; and he/she further agrees not to disclose or use at any time information which is designated by [Metso] as confidential except as required by duties as [a] [Metso] employee.

(Id. at 4).

Similarly, Metso asks departing employees to sign a termination agreement which states:

In accordance with my continuing obligations as a former employee of Metso, I hereby certify and agree that I have disclosed or promptly will disclose to Metso all proprietary, secret or confidential information to which I have been exposed during the course of my employment with Metso. I also certify that in the future I will not disclose or use any proprietary, secret or confidential information of Metso without Metso's express written consent. Proprietary, secret or confidential information means information that is not generally known outside of Metso, which derives independent economic value, actual or potential, from not being generally known to or ascertainable by persons outside of Metso, and information that Metso has a reasonable expectation will not be disclosed to persons outside Metso without its permission. I certify and agree that I have delivered or promptly will deliver to Metso all reports, customer lists and all other business or technical materials of a proprietary, secret or confidential nature owned by or originated at Metso which have been or are in my possession or under my control.

(Id. at 3-4). Martinez, Sullivan and Olson each signed a termination agreement containing the above quoted language. (Id. at 3-5).

## ANALYSIS

According to Metso's Fifth Amended Complaint, Martinez, Sullivan and Olson violated their contractual duties respecting their employment applications and, separately, their respective termination agreements by each disclosing information to their subsequent employers, Excel Foundry & Machine, Inc. ("Foundry") and Excel. Metso also alleges that Foundry and Excel, as well as Douglas Parsons and

-3-

Richard Parsons – both high ranking officers in both Foundry and Excel – committed tortious interference with contract by encouraging the former employees to acquire and disclose information in violation of the nondisclosure provisions of the employment applications and termination agreements. Defendants have moved for summary judgment on these claims on two grounds. Defendants argue that the restrictive covenants in the employment applications and the termination agreements are, per se, invalid pursuant to Wis. Stat. 103.465 because they do not contain geographic or temporal limitations. Defendants also argue that the restrictive covenants in the termination agreements were not supported by consideration, and thus are unenforceable.

**I.    Summary Judgment Standard**

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine

-4-

issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II. Validity of Restrictive Covenants

Wisconsin Statutes § 103.465 states:

> A covenant by an assistant, servant or agent not to compete with his or her employer or principal during the term of the employment or agency, or after the termination of that employment or agency, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any covenant, described in this subsection, imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint.

Wis. Stat. § 103.465. It is undisputed that the restrictive covenants in the employment applications and the termination agreements do not contain geographic or temporal limitations. It is also clear that a restrictive covenant covered by § 103.465 that does not contain any geographic or temporal limitations is void and unenforceable. The question before the court is whether the restrictive covenants at issue are covered by § 103.465. If they are, then the next question is whether the unenforceable provisions can be severed so as to allow the enforcement of the remaining provisions.

### A. Applicability of § 103.465

Wis. Stat. § 103.465, by its plain language, expressly applies to "[a] covenant . . . not to compete with [an] employer . . . after the termination of that employment." The statute does not address non-disclosure provisions. However, the Wisconsin Supreme Court has held that a non-disclosure provision is subject to § 103.465 if it

-5-

"seeks to restrain competition." *Tatge v. Chambers & Owen, Inc.*, 579 N.W.2d 217, 223 (1998).

Metso argues, convincingly, that its non-disclosure agreements do not seek to restrain legitimate competition, because they are only aimed at preventing employees from utilizing and disclosing Metso's confidential information. Metso goes on to explain that it would be bad public policy to require temporal and geographic limits on provisions protecting confidential information, because such information belongs to the employer and should not ever be utilized or disclosed. Metso's argument is not without merit. However, as defendants point out, it is an argument better addressed to the legislature, for it is clearly refuted by present Wisconsin case law.

In *Tatge*, the Wisconsin Supreme Court addressed the validity of a non-disclosure provision that stated:

> Employee recognizes and acknowledges that the customer data, programs, and business practices used or employed by Employer embody and involve the use of information of a confidential nature which represents an asset of substantial value. Employee will not, without prior authorization, during or after the term of employment with Employer, disclose such information to any person, firm, corporation, association, or other entity for any reason or purpose whatever.

579 N.W.2d at 218. The court held that it was "clear that [the employer] [sought] to restrain competition through the use of the non-disclosure provision[;] [i]t seeks to shield its customer data, programs, and business practices from competitors' eyes because it 'represents an asset of substantial value.'" *Id.* at 222. The court, therefore, held that the provision was subject to the requirements of § 103.465.

As Judge Crabb pointed out in *Friemuth v. Fiskars Brands, Inc.*, 2010 WL 396128 (W.D. Wis.), "[f]ollowing *Tatge* . . . it is difficult to see how any nondisclosure agreement could be viewed as falling outside § 103.465." Thus, unsurprisingly, Metso is not able to offer any compelling argument distinguishing *Tatge*. The best Metso can do is to cite to *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581 (7th Cir. 2002), which Metso argues supports its proposition that temporal and geographic limits are inapplicable to non-disclosure agreements pertaining to intellectual property. Metso argues that *IDX* "distinguished . . . *Tatge* . . . as involving provisions aimed at restraining competition by ex-employees and at restricting those employees' employment options, rather than provisions which, like the provisions here, are aimed merely at protecting valuable confidential intellectual property." (Metso Br. Opp. Mot. S.J. [Dkt. 305] at 11). This argument is unavailing because the *IDX* court specifically found that § 103.465 was inapplicable to its analysis since the provision at issue in *IDX* was between a supplier and a user of intellectual property, rather than between an employer and employee.   285 F.3d at 585.[3] Additionally, contrary to what Metso states, no where did the *IDX* court state that *Tatge* was distinguishable because it dealt with "restricting employees' employment

---

[3] The *IDX* court went on to explain:

> The parties have not cited, and we have not found, any Wisconsin statute or decision subjecting non-disclosure agreements between suppliers and users of intellectual property to the rules that govern non-competition clauses between employers and employees. To the contrary, *Fullerton Lumber Co. v. Torborg*, 70 N.W.2d 585, 588 (1955), tells us that Wisconsin allows "a much greater scope of restraint in contracts between vendor and vendee than between employer and employee."

*IDX*, 285 F.3d at 585.

options." Rather, the *IDX* court distinguished *Tatge* purely on the grounds that *Tatge* dealt with an employer-employee relationship. The instant case is distinguishable from *IDX* on the very same grounds.

It is evident that a substantial aspect of the purpose of the non-disclosure provisions in the instant case was to shield Metso's proprietary, secret and confidential information from its competitors. Despite the good public policy reasons for not subjecting such provisions to § 103.465, *Tatge* makes it clear that such provisions are a "restraint on trade" and are subject to § 103.465.

However, Metso could conceivably be exempted from the requirements of § 103.465 if it could show that the provisions were aimed at protecting trade secrets. *See Gary Van Zeeland Talent, Inc. v. Sandas*, 267 N.W.2d 242, 209-10 (Wis. 1978) (explaining that provisions restraining trade may be acceptable when designed to protect trade secrets). However, as Judge Crabb pointed out, "[e]ven if a nondisclosure provision restricts disclosure of trade secret information, if it also restricts disclosure of information that is not a trade secret, § 103.465 requires a time [and geographic] limitation on the provision." *Friemuth*, 2010 WL 396128 at 5. Thus, the only way Metso's non-disclosure provisions could be exempt from § 103.465 would be if they only restricted disclosure of trade secret information. See *Nalco Chemical Co. v. Hydro Technologies, Inc.*, 984 F.2d 801, 803 (7th Cir.1993) (If the confidential-information clause "protects information that does not constitute trade secrets, then the terms of the clause must be reasonable in time and scope to be enforceable.") (applying Wis. Stat. § 103.465).

The termination agreements protect two types of information:

1) "information that is not generally known outside of Metso, which derives independent economic value, actual or potential, from not being generally known to or ascertainable by persons outside of Metso," and

2) "information that Metso has a reasonable expectation will not be disclosed to persons outside Metso without its permission."

(Metso Br. Opp. Mot. S.J. at 6). The first type of information could reasonably be described as limited to trade secrets. *See* Wis. Stat. § 134.90(1)(C).[4] However, the second type of information clearly encompasses more than trade secrets. Since the second type of information is additional to the first type of information (as opposed to if the entire provision only protected information that fell within both categories of information), the provisions are clearly designed to prevent disclosure of information beyond just trade secrets. Thus, the non-disclosure provisions in the termination agreements are subject to § 103.465.

The non-disclosure provisions in the Martinez/Olson Applications prevent disclosure of "confidential information derived in the course of . . . employment." The non-disclosure provision in the Sullivan Application prevents disclosure of "information which is designated by [Metso] as confidential except as required by

---

[4] Wis. Stat. § 134.90(1)(C) states:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:

1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

duties as [a] [Metso] employee." Clearly, these provisions restrict disclosure of information beyond just trade secrets. Hence, the non-disclosure provisions in the employment applications are subject to § 103.465.

### B.  Severability of Unenforceable Portions of Provisions

Metso argues that even if the non-disclosure provisions are unenforceable, the remaining provisions in the termination agreements[5] are divisible from the non-disclosure provisions, and thus remain enforceable. The concept of divisibility pre-dates the adoption of § 103.465, and arises under common law.

"Before the enactment of § 103.465 [the Wisconsin Supreme Court] followed the so called blue pencil rule:  if the terms of a restraint were divisible the court struck the overly broad language of a restraint and enforced the valid restraints in the contract." *Streiff v. Amer. Family Mut. Ins. Co.*, 348 N.W.2d 505, 509 (Wis. 1984). "Under the blue pencil rule, if the terms of a restraint were indivisible, that is, the contract itself furnished no basis for dividing the restriction into reasonable and unreasonable portions, the whole covenant was void if any part of the restriction was unreasonable." *Id.* However, in a 1955 case, *Fullerton Lumber C. v. Torberg*, 70 N.W. 2d 585 (Wis. 1955) the court "departed from the blue pencil rule and enforced an invalid indivisible covenant insofar as it was reasonable." *Streiff*, 348 N.W.2d at 509. In *Fullerton*, the court concluded that the 10-year period of restraint imposed by the applicable provision was unreasonable; however, the court determined that

---

[5] Metso makes no argument that the non-disclosure provisions of the employment applications are divisible.

-10-

a 3-year period would be reasonable, and thus enforced the restrictive covenant as to a 3-year period. *Streiff*, 348 N.W.2d at 509.

In response to the *Fullerton* court's departure from the blue pencil rule, the legislature adopted § 103.465. *Streiff*, 348 N.W.2d at 509. Specifically, the legislature was concerned that the rule from *Fullerton* would lead to employers intentionally drafting overbroad restrictive covenants in the hopes that such covenants would be found enforceable, but confident in the fact that even if they were not enforceable, they would still be enforced to the fullest extent possible. *Streiff*, 348 N.W.2d at 509. After passage of § 103.465, the question arose as to whether the statute prohibited all blue penciling, or just the type of blue penciling that occurred in *Fullerton* – that of indivisible provisions. The Wisconsin Supreme Court answered that question in *Star Direct, Inc. v. Dal Pra*, 2009 WI 76, 767 N.W.2d 898 by stating: "Though the question was withheld in *Streiff*, we now make clear that we believe the legislative history and text of the statute do not eliminate or modify the common law rules on divisibility." 2009 WI at ¶ 76.

Thus, the unenforceable non-disclosure provisions can be struck from the termination agreements, and the remaining provisions of the termination agreements can be enforced, if it can be fairly said that the non-disclosure provisions are divisible from the remaining provisions. "The foundational inquiry for determining whether a covenant is divisible is whether, if the unreasonable portion is stricken, the other provision or provisions may be understood and independently enforced." *Star Direct*,

2009 WI at ¶ 78. "This inquiry will be fact-intensive and depend on the totality of the circumstances." *Id.*

As previously stated, the termination agreements state:

**(1)** In accordance with my continuing obligations as a former employee of Metso, I hereby certify and agree that I have disclosed or promptly will disclose to Metso all proprietary, secret or confidential information to which I have been exposed during the course of my employment with Metso. **(2)** I also certify that in the future I will not disclose or use any proprietary, secret or confidential information of Metso without Metso's express written consent. **(3)** Proprietary, secret or confidential information means information that is not generally known outside of Metso, which derives independent economic value, actual or potential, from not being generally known to or ascertainable by persons outside of Metso, and information that Metso has a reasonable expectation will not be disclosed to persons outside Metso without its permission. **(4)** I certify and agree that I have delivered or promptly will deliver to Metso all reports, customer lists and all other business or technical materials of a proprietary, secret or confidential nature owned by or originated at Metso which have been or are in my possession or under my control.

(Defs. Br. Supp. Mot. S.J. at 3-4) (numbering added for reference purposes). The first question the court must answer is whether the above paragraph is a single covenant. In practice, individual covenants are typically set out in individual paragraphs. If the fact that the various provisions are all contained within one paragraph means that they are all part of a single covenant, then the entire paragraph is unenforceable. *See Star Direct*, 2009 WI at ¶ 76 ("The statute's prescriptions . . . apply to any 'covenant,' not to the whole employment contract. It specifies that if a restraint is unreasonable, the rest of that covenant is also unenforceable."). However, defendants do not argue that the structure of the termination agreements (i.e., the inclusion of each provision within a single

-12-

paragraph) requires a finding that the entire paragraph constitutes a single covenant. Additionally, the court's own research has not revealed anything requiring such a finding.

In fact, the only case the court was able to find offering any guidance on the matter, *General Bronze Corp. v. Schmeling*, 243 N.W. 469 (Wis. 1932), strongly indicated that separate provisions within a single paragraph are divisible. In *General Bronze* the relevant language stated:

> The stockholders agree that they will not at any time within fifteen years from date of transfer to General Bronze of said business, assets and good will of the Wisconsin Company, directly or indirectly engage in the manufacture or sale of architectural and ornamental bronze and/or iron work (except in the capacity of the agent or employee of General Bronze, its successors and assigns, within any of the several states of the United States of America, or in the territories thereof, or within the District of Columbia, except and reserving however the right to manufacture and sell bronze and/or iron work in the state of Nevada), nor within the Dominion of Canada or the Republic of Mexico[.]

243 N.W. at 470. The *General Bronze* court found that the provisions regarding Canada and Mexico were unenforceable. However, the court also found that those provisions were divisible from the enforceable provision regarding the United States, because the geographic areas were "disjunctively described." *General Bronze*, 243 N.W. 469 at 473.

The only problem with the ruling in *General Bronze* is that the court stated that the "disjunctively described" geographic areas "furnish[ed] a proper basis . . . for *dividing the covenant* and enforcing it in the territory" described in the enforceable provision. *Id.* (emphasis added). This is problematic because "dividing the

-13-

covenant" is specifically disallowed by § 103.465. However, if the phrase "dividing the covenant" was simply poor word choice, and the true thrust of *General Bronze* is that disjunctive provisions within a single paragraph may be divisible, then *General Bronze* may still be followed. Indeed, the court has every reason to suspect that this is in fact the case. Perhaps the most compelling evidence that *General Bronze* is still useful in an analysis of divisibility is the fact that it was cited approvingly by the *Star Direct* court as an example of the common law approach to divisibility.[6] Also compelling is that the definition of the word "covenant" supports the action taken in *General Bronze*, rather than the unfortunate word choice ("dividing the covenant") used to describe that action. According to Black's Law Dictionary (8th ed. 2004) a covenant is "[a] formal agreement or promise." Indeed, the most logical reading of *General Bronze* is that the court found that the given language contained three insular promises: one not to compete in the U.S. and its territories (other than Nevada), one not to compete in Canada, and one not to compete in Mexico. Thus, regardless of the language used by the *General Bronze* court, it was not dividing a single covenant, it was rather striking two unenforceable covenants, and enforcing the one remaining, divisible, covenant regarding the U.S. Any other reading of *General Bronze* would ignore the definition of the term "covenant" and would contradict the Wisconsin Supreme Court's recent reference to *General Bronze* in its opinion in *Star Direct*.

---

[6] As previously explained, the *Star Direct* court explicitly stated that § 103.465 "[did] not eliminate or modify the common law rules of divisibility." 2009 WI at ¶ 76.

-14-

Accordingly, the fact that each provision of the termination agreement is contained within a single paragraph does not mean that the entire paragraph is a single covenant. Rather, the most logical reading of the termination agreement is that it contains three separate and disjunctive promises or covenants. The first sentence requires the signor to disclose to Metso all proprietary, secret and confidential information learned during the signor's employment. The second sentence prohibits the signor from disclosing or using any proprietary, secret or confidential information. The third sentence does not contain a covenant, but merely defines the phrase "proprietary, secret, or confidential information." The fourth sentence requires the signor to return certain specified materials to Metso.

The court has already held that the covenant in the second sentence is per se invalid according to § 103.465. Additionally, there has been no argument presented, nor is there reason to hold, that the covenants in the first and fourth sentence are invalid in their own right. Defendants' only basis for arguing that the covenants in the first and fourth sentence are invalid is that they are indivisible from the covenant in the second sentence.

Defendants maintain that the covenants in the first and fourth sentence are indivisible from the invalid covenant in the second sentence because the various provisions are "textually intertwined." However, whether provisions are "textually intertwined" is not its own test of divisibility, rather it simply can be an indication of indivisibility. *See Star Direct*, 2009 WI at ¶ 78. The actual test is "whether, if the unreasonable portion is stricken, the other provision or provisions may be

-15-

understood and independently enforced." *Id.* In the instant case, the three covenants in the termination agreements are not "textually intertwined". They do not cross reference one another, nor rely on each other in order to be understood. It is true that each of them relies on the definition in the third sentence in order to be understood; however, there is no argument that the third sentence constitutes an independent covenant, or that there is any basis for striking the third sentence (other than the argument that it is indivisible from the second sentence). Ultimately, when the unreasonable portion (the second sentence) is stricken, the covenants in the first and fourth sentence are still easily understood and independently enforceable.[7]

## III. Adequacy of Consideration

Defendants argue that the termination agreements were not supported by adequate consideration. Given the above analysis – holding that the only basis for Metso's breach of contract claims and tortious interference claims are the covenants in the first and fourth sentence of the termination agreements – this question of consideration as to the termination agreements is now dispositive as to defendants motion for summary judgment on these claims.

Defendants argue that none of the three former employees received any consideration for signing the termination agreements. Defendants submitted

---

[7] The court further notes that its ruling regarding the divisibility of the various covenants in the termination agreements does not implicate the concerns addressed by § 103.465. As previously explained, the legislature was concerned about courts re-writing invalid provisions in order to make them valid. For example, if this court were to attempt to limit the non-disclosure provision only to trade secrets in order to make the provisions enforceable, that would be the type of action that § 103.465 is designed to prevent. Thus, the court has complied with § 103.465 by striking the non-disclosure provisions in their entirety. The court's ruling that the remaining provisions are enforceable does not contradict § 103.465, and is consistent with the holdings of the Wisconsin Supreme Court in *General Bronze* and *Star Direct*.

-16-

declarations from Martinez, Sullivan and Olson – each stating that they received no consideration for signing the termination agreement – as proof that the agreements are not supported by adequate consideration. However, Metso submitted the declarations of Becky Anhalt and Jack Mueller as evidence that the former employees did receive consideration for signing the termination agreements. Anhalt, a Corporate Benefits Coordinator, declared that she conducted each of the former employees' exit conferences. (Decl. Anhalt [Dkt. 292] ¶¶ 2-3). She further declared that she explained to the former employees the post-termination benefits they would receive, and presented each of them with the termination agreement, and that each signed the agreement without protest. (Id. ¶¶ 4-5). Anhalt stated that if they had not signed the agreements, she would have alerted Mr. Mueller, Vice President of Human Resources at Metso at the time. (Id. ¶ 5); (Decl. Mueller [Dkt. 293] ¶ 3). Mueller declared that if a departing employee refuses to sign the termination agreement, then they do not receive the post-termination benefits offered by Metso. (Id. ¶ 10). Defendants, in their reply brief, essentially drop the argument that the termination agreements were not supported by consideration,[8] but instead argue that there was no meeting of the minds.

Defendants maintain that the former employees did not know that their post-termination benefits were contingent on signing the termination agreements, thus no meeting of the minds occurred, and valid contracts were not formed. "Whether there

---

[8] To the extent that defendants might claim that they have not dropped their argument that there was no consideration, defendants are free to argue that the post-termination benefits were not consideration for the former employees signing the agreements, and present evidence in support thereof, to the fact finder.

-17-

has been a meeting of the minds sufficient to form a contract is a question of fact." *Otradovec v. State of Wis. Real Estate Bd.*, 1986 WL 217286 *1 (Wis. App.) (citing *Household Utilities, Inc. v. Andrews Co.*, 236 N.W.2d 663, 669 (Wis. 1976)). Hence, the court is obliged to deny defendants' Motion for Summary Judgment.[9]

## CONCLUSION

Wis. Stat. § 103.465 renders covenants that restrict competition between employers and employees invalid if such covenants do not contain reasonable geographic and temporal limitations. The non-disclosure provisions of the employment applications and termination agreements do not contain any geographic or temporal limitations, thus, they are, per se, invalid pursuant to § 103.465. However, the termination agreements contained two other covenants (those found in the first and fourth sentences of the agreements) that were both valid and enforceable. Because the invalid covenant found in the second sentence of the termination agreements was divisible from the remaining provisions in the agreements, the covenants in the first and fourth sentences of the termination agreements remain enforceable. However, this is only true if the termination agreements were valid contracts. To be valid contracts, they must be supported by consideration, and there must have been a meeting of the minds by the contracting

---

[9] Metso argues that the court should find that the former employees are estopped from challenging the validity of the termination agreements, since the former employees accepted the benefits of those agreements – namely the post-termination benefits, and the ability to allegedly more easily misappropriate Metso's proprietary, secret, and confidential information. However, Metso has not produced any case law showing that a party can be estopped from challenging a contract if there is a question of whether there was ever a meeting of the minds as to that contract. Thus, if the former employees did not know they were benefitting from signing the termination agreements, then it is unclear whether they could be estopped from now challenging the agreements on the basis of receiving that benefit.

-18-

Case 2:07-cv-00926-JPS   Filed 05/07/10   Page 18 of 19   Document 372

parties. There are material factual disputes as to these latter two questions. Thus, the court is obliged to deny defendants' motion for summary judgment on counts 11, 12, 26, and 27, except as to the extent such claims are based on: 1) the employment applications; or 2) the non-disclosure provisions of the termination agreements. Similarly, because Metso's motion for summary judgment on its breach of contract claim against Martinez hinges on the enforceability of Martinez's employment application (which is not enforceable) and/or his termination agreement (which may or may not be enforceable), the court is obliged to deny Metso's motion at this time.

Accordingly,

**IT IS ORDERED** that defendants' Motion for Summary Judgment on Counts 11, 12, 26, and 27 of the Fifth Amended Complaint (Docket #228) be and the same is hereby **DENIED** in part and **GRANTED** in part, as specified above; and

**IT IS FURTHER ORDERED** that Metso's Motion for Summary Judgment for Breach of Contract by Joseph Martinez (Docket #247) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 7th day of May, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge