UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

METSO MINERALS INDUSTRIES, INC.,

     Plaintiff,

    v.

                                   Case No. 07-CV-00926

FLSMIDTH-EXCEL LLC,
EXCEL FOUNDRY & MACHINE, INC.,
JOSEPH P. MARTINEZ, CHERYL A.
SULLIVAN, KENNETH L. OLSON,
DOUGLAS M. PARSONS, RICHARD A.
PARSONS, AND CHRISTOPHER P. WADE,

     Defendants.

Judge J. P. Stadtmueller

---

**DECLARATION OF JOHN A. GIESCHEN IN OPPOSITION TO DEFENDANTS'
MOTION TO STRIKE METSO'S EXPERT, JEFFREY J. LAWNICKI**

---

    I, John A. Gieschen, declare under penalty of perjury that the following is true and correct:

    1.     I am a Mechanical Engineer with nearly 40 years of experience working with heavy mining machinery with at least 20 years spent in designing of rock crushers. I obtained a Bachelors of Science in Mechanical Engineering from Valparaiso University in 1955 and shortly thereafter started working with mining equipment, including Omnicone, HP and MP cone crushers.

    2.     I understand that this case involves Metso's MP, HP and Excel's Raptor cone crushers. I am familiar with these products and have done engineering work for both Nordberg, (now known as Metso) and Excel. Specifically, while I was working at Metso, I was the project leader for design of the first Omnicone crusher and later performed engineering work for various sizes of the HP and MP crushers. I retired from Metso in May, 1995.

3.      In 2004 and 2005, I did consulting work for Excel to automate the basic engineering calculations needed to evaluate the unbalanced forces in developing its Raptor crushers.

4.      While I was working for Metso, I acted as a technical expert for the company in a trade secret case.  In that case, I compared Metso's detailed manufacturing drawings to those of the competitor accused of stealing Metso's design drawings and gave an opinion about whether I believed that the competitor had used Metso's design drawings to create its drawings.  When I made this comparison, I compared the general layout of the design drawings, the relative position of views and features as well as specific design specifications including tolerances, clearances, nominal dimensions, surface finishes, machining notes and calculated dimensional matches.

5.      In my analysis, I placed particular importance on whether the competitor's drawings had multiple tolerances that matched Metso's tolerances.  From my experience designing conical crushers, I know of no engineering handbooks that provide the tolerances used on Metso's drawings.  Instead, tolerances were developed based on experience and judgment.  Additionally, because a tolerance represents the acceptable range within which a part can be manufactured, it is not possible to reverse engineer a tolerance by measuring one part.  If only one part is measured, it would be impossible to know whether that part fell in the exact middle of the specified tolerance range, or whether that part fell on the upper or lower end of the acceptable range.  Because a tolerance is chosen by the design engineer based primarily on that engineer's experience and judgment, it is highly unlikely that a second engineer, without reference to corresponding drawings, would consistently name the exact same tolerances for the same dimensions.  When I did my analysis, I concluded that multiple matching tolerances between Metso's drawings and the competitor's drawings indicated copying.

6.      During my time at Metso, I supervised the design and drafting work of others in the engineering department.  When checking drawings of a new size crusher in an existing product line, I made dimension-to-dimension comparisons between drawings of the new crusher and corresponding drawings of the existing Metso crusher to assure that their tolerances matched.  I also matched other features such as angles, surface finishes, and manufacturing instructions.  In my experience, the matching of tolerances and specifications from an existing Metso drawing was a common way, and also the best way, to choose practical and successful specifications for a new drawing.  In the instance when I compared Metso's drawings to a competitor's drawings, my frequent experience in creating matches from one Metso drawing to a new Metso drawing enabled me to confidently identify matches.  Using the same drawing-to-drawing comparison of nominal dimensions, tolerances, angles, surface finishes and other manufacturing instructions I reported matches which to me indicated improper access to Metso drawings.

7.      I understand that Jeff Lawnicki compared Metso design drawings to some of Excel's and Foundry's drawings and that in doing so, he compared design features such as tolerances, nominal dimensions, angles, surface finishes, datums, calculated dimensions, and manufacturing instructions, using the methodology set forth in the attached Exhibit A.  Based on my experience, this same basic methodology involving drawing-to-drawing comparisons is commonly used in preparation of new drawings within one company, as explained in paragraph 6, above.  It is also the same basic methodology that I used as an expert witness in determining whether design drawings had been developed based on copying, as explained in paragraphs 4 and 5, above.

Dated:  May 21, 2010

  /s/ John A. Gieschen_____
John A. Gieschen